# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MEGHAN CASEY, et al.,          )
                                    )
                Plaintiffs,     )
                                    )
v.                                )  Docket no. 2:19-cv-00392-GZS
                                    )
TOWN OF YARMOUTH,      )
                                    )
                                    )
                Defendant.     )

## ORDER ON PENDING MOTIONS

Before the Court are two motions:  Plaintiffs' Motion for Judgment on a Stipulated Record (ECF No. 14) and Defendant's Motion for Judgment on a Stipulated Record (ECF No. 16).  Via these cross-motions, the parties ask the Court to resolve this matter in which Plaintiffs, six Yarmouth residents, including a member of the Town Council, challenge the constitutionality of an amendment to the Town's charter.[1]  As explained herein, the Court GRANTS Defendant's Motion (ECF No. 16) and DENIES Plaintiffs' Motion (ECF No. 14).

## I.  LEGAL STANDARD

When facing cross-motions for judgment on a stipulated record, the Court, in addition to resolving any legal disputes, "may 'decide any significant issues of material fact that [it] discovers' in the stipulated record." Thompson v. Cloud, 764 F.3d 82, 90 (1st Cir. 2014) (quoting Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD, 768 F.2d 5, 11–12 (1st Cir. 1985) (discussing differences between a motion for summary judgment and a motion for judgment on a stipulated record)).  In rendering judgment, the Court makes findings of fact on any disputed factual issues

---

[1] The Court notes that the briefing process for this Motion was the result of a joint motion of the parties (ECF No. 9), which was granted by the Magistrate Judge.  See 7/31/20 Procedural Order (ECF No. 12).

in accordance with Federal Rule of Civil Procedure 52.  See OneBeacon America Ins. Co. v. Johnny's Selected Seeds Inc., No. 1:12-cv-00375-JAW, 2014 U.S. Dist. LEXIS 53098, at *2–3 (D. Me. April 17, 2014).  Thus, pursuant to Rule 52(a), the Court sets forth the following factual findings based on the stipulated record.

## II.     FINDINGS OF FACT

### A.  The Town of Yarmouth

Defendant Town of Yarmouth is located in Cumberland County, Maine.  Under its charter, "[t]he administration of all the fiscal, prudential and municipal affairs of [the] town" is vested in a seven-member Town Council, except for "the general management, care, conduct and control of the schools of the town," which is vested in a separate School Committee.  (Joint Ex. 2-A ("Charter") (ECF No. 13-6), PageID # 140.)  Councilors are elected to terms lasting three years during which they are paid "$1,000 per year for attendance at meetings of the Council or its subcommittees."  (Id., PageID #s 142–43.)

The Council's enumerated powers include the power to recommend the annual budget, which is subject to a public vote at the annual Town Meeting.  (Id., PageID # 143.)  Early in the budget development process, the School Committee presents "budget estimates in detail of the several sums required during the ensuing budget year for the support of the public schools" to the Town Manager.  (Id., PageID #s 148–49.)  The Town Manager then submits "a budget and an explanatory budget message" to the Council.  (Id., PageID # 150.)  The Council then "approve[s] the budget with or without amendments."  (Id.)  The Council's authority is limited to setting a recommended "final determination of the total appropriation to be made to each of the several offices, departments and agencies of the town, including the department of education."  (Id.)  After a public hearing, the Council finalizes its recommended budget for the Town Meeting vote.  Voters at this annual meeting are not permitted to "increase the amount of any appropriation above the

amount recommended by the council or make any appropriation not recommended by the council and [may] not increase the amount of any bond issue above the amount recommended by the council."  (Id., PageID # 155.)  In short, as explained by Town Manager Nathaniel Tupper, "the Town Council effectively creates a ceiling on appropriations for competing departments of the Town and the voters cannot override the Town Council's determination . . . to increase a particular department's proposed budget allocation."[2] (Tupper Decl. (ECF No. 17-1), PageID # 651.)

Prior to November 2018, the charter set forth the following qualifications for Councilors:

Councilmen shall be qualified voters of the town and shall reside in the town during their term of office.  They shall hold no office of emolument or profit under the town charter or ordinances.

In case of a vacancy caused by death, resignation, removal from the town, or removal from office as hereinafter provided, of any member of the town council more than 6 months prior to the next regular municipal election, the vacancy shall be filled by a special election for the unexpired portion of the term.  In the event such vacancy occurs less than 6 months prior to the next regular municipal election, the vacancy may be filled by a special election for the unexpired portion of the term.  Such election shall be called and held and nominations made as in regular municipal elections.

Any member of the town council who has been convicted of a felony or a misdemeanor involving moral turpitude while in office shall, after due notice and hearing before the town council and the production of the records of such conviction, forfeit his office.

(Id., PageID #s 165–66.)   In November 2018, the following amendment (the "Charter Amendment" or the "Amendment") was adopted by a referendum vote:

**Councilpersons** ~~Councilmen~~ shall be qualified voters of the town and shall reside in the town during their term of office.  They shall hold no office of emolument or profit under the town charter or ordinances.  **No Councilor shall hold any other paid office or position of employment with the Town or Department of**

---

[2] "In addition to having the power to craft the proposed budget and withhold the proposed budget from submission to voters for approval or denial at the Town Meeting (or by referendum), the Town Council has the power to withhold from the voters a) debt authorizations, and b) any supplemental budget appropriations in excess of $100,000. Thus, an employee sitting on the Town Council (or a block of such employees) could withhold his or her vote to submit to voters the annual budget; a bond vote, or a special appropriation request unless desired adjustments are first made by other members of the Town Council to meet such objectives." Tupper Decl. (ECF No. 17-1), PageID # 651.

**Education (School Department) during the term for which the Councilor was elected to the Council. If a Councilor or Councilor-Elect shall fail to meet any of these qualifications, the Town Council shall, by resolution, declare the office of that Councilor or Councilor-Elect vacant.**

In case of a vacancy caused by death, resignation, removal from the town, or removal from office as ~~hereinafter~~ provided, of any member of the town council more than 6 months prior to the next regular municipal election, the vacancy shall be filled by a special election for the unexpired portion of the term. In the event such vacancy occurs less than 6 months prior to the next regular municipal election, the vacancy may be filled by a special election for the unexpired portion of the term. Such election shall be called and held and nominations made as in regular municipal elections.

Any member of the town council who has been convicted of a felony or a misdemeanor involving moral turpitude while in office shall, after due notice and hearing before the town council and the production of the records of such conviction, forfeit his office.

**Town employees and School Department employees serving on the Yarmouth Town Council on the date of passage of this amendment are exempt from the provisions of this Charter provision for the remainder of their current term.**

(Id.) To summarize, the Amendment prohibited any paid official or employee of the Town or its school department from serving on the Council, but any current employee-councilors would be allowed to finish their term.

Prior to the Amendment, Councilors had already been subject to both a Maine statute and their own Council Rules governing conflicts. Under the Council Rules:

Councilors are required . . . to disclose any potential conflict of interest they may have in any agenda item before the Council. Once a disclosure is made, the Councilor shall either abstain from the decision-making process (including any discussion, deliberation and/or vote) regarding that agenda item or shall explain why he or she believes his or her abstention is not necessary.

(Joint Ex. 1-B (ECF No. 13-3), PageID # 84.) Under the relevant Maine statute, 30-A M.R.S.A. § 2605, "[t]he vote of a body is voidable when any official in an official position votes on any question in which that official has a direct or an indirect pecuniary interest." 30-A M.R.S.A. § 2605(1). The statute further requires officials to avoid giving the appearance of conflict by

4

disclosure or abstention.  30-A M.R.S.A. § 2605(6).  However, the statute also contains a carveout concerning teachers: "This subsection does not prohibit a member of a city or town council or a member of a quasi-municipal corporation who is a teacher from making or renewing a teacher employment contract with the municipality or quasi-municipal corporation for which the member serves."  30-A M.R.S.A. § 2605(4)(A) (effect of direct or pecuniary interest on vote).

### B.  The Plaintiffs

Plaintiff Meghan Casey is a teacher at Yarmouth High School and a current Councilor. (Casey Decl. (ECF No.  15-1), PageID # 575.)  Casey was elected in June 2018.  (Id.)  During her tenure on the Council, Casey has not recused herself at meetings or hearings considering the annual budget.  (Id., PageID # 577.)  She wishes to campaign for re-election and to serve an additional term.  (Id., PageID # 576.)  Casey also maintains that the Charter Amendment denies her the ability "to select a candidate that she believes is most qualified to serve in office if that candidate is an employee of the town or school department."  (Joint Ex. 3-A (ECF No. 13-10), PageID # 255.)

Plaintiff Elizabeth Reinsborough was an administrative assistant at Harrison Middle School until her retirement in September 2020. (E. Reinsborough Decl. (ECF No. 15-3), PageID # 581.)  She has an interest in running for the Yarmouth Town Council.  (Id.)  She wishes "to be able to talk to candidates for town council and to decide for [herself] whether or not they would make a good councilor."  (Id., PageID # 582.)  Ultimately, Ms. Reinsborough asserts that she may or may not decide to vote for someone who is a Town or school department employee.  (Id.)

Plaintiff Mark Reinsborough is employed by Yarmouth as a volunteer firefighter.  (M. Reinsborough Decl. (ECF No. 15-4), PageID # 583.)  He is interested in running for the Yarmouth Town Council, but does not want to have to choose between service on the Council and his work as a volunteer firefighter.  (Id.)  If he were to leave his volunteer firefighter position, it would have negative ramifications for his state-issued EMT license.  (Id.)  He asserts that he "might decide,

5

after careful deliberation, to publicly support a candidate for town council who is an employee of the town or the school department," but also acknowledges that he "might decide not to." (Id., PageID # 584.)

Plaintiff Thomas Reinsborough is a former Councilor and volunteer firefighter. (T. Reinsborough Decl. (ECF No. 15-5), PageID # 585.) He is married to Elizabeth Reinsborough and is the father of Mark Reinsborough. (Id., PageID # 586.) In 1992, during the elder Reinsborough's simultaneous tenures on the Council and with the fire department, he voted to accept a gift of exercise equipment for the exclusive use of Town employees, and he was the lone vote against a request from the Fire Chief to develop specifications and bids for a new fire truck. (Joint Ex. 2-C (Council Minutes) (ECF No. 13-8), PageID #s 228–32.) Reinsborough also cast a vote, in 1993, against recommending the budget for approval at the Town Meeting. (Id., PageID #s 233–37.) Now, he would like to be able to decide for himself whether or not to vote for his son, his wife, Casey, or any other Town or school department employee who might run for Town Council in the future. (T. Reinsborough Decl., PageID # 586.)[3]

Plaintiffs Kathryn Sharpless and David Ray are both Yarmouth residents who wish to be able to vote to reelect Casey. (Ray Decl. (ECF No. 15-2), PageID # 579; Sharpless Decl. (ECF No. 15-6), PageID # 588.) Both Sharpless and Ray would also like to be able in the future to vote for other Town or school department employees who might choose to run for the Town Council. (Ray Decl., PageID # 579; Sharpless Decl., PageID #s 588–89.) However, Sharpless also indicates

---

[3] In the record presented, there is brief mention in an informal email correspondence between the Town Manager and an unidentified individual that between one and three other municipal employees may have served as Councilors prior to Thomas Reinsborough. See Joint Ex. 4-B (ECF No. 13-18), PageID # 334. Although the parties have not themselves raised hearsay concerns relating to this evidence, the Court declines to make a finding on the issue due to indicia of unreliability on the face of the evidence. See id. ("*I cannot speak with certainty*, but I think Phil Harriman was an officer (with a small stipend) in the Yarmouth Fire Department and a Town Councilor. That *may* have also been true for Erv Bickford at one time." (emphasis added)).

that she is "significantly less likely" to campaign or vote for a candidate that she knows would be ineligible to serve.  (Sharpless Decl., PageID # 589.)

### C.  The June 2018 Municipal Election

In 2017, Casey expressed her interest in running for Town Council.  The Town consulted with the Town Attorney on the issue, who opined that being a school employee was neither incompatible with Council membership nor Maine law (particularly citing the carveout in § 2605 for teachers).[4]  (Joint Ex. 4-B, PageID #s 342–47.)  In fact, the Town Attorney had earlier noted that any restriction of local teachers serving on Town Council could potentially violate the First Amendment citing existing precedent from the Maine Supreme Judicial Court.  (Id., PageID #s 343–44.)  The Yarmouth School Department also contacted its own counsel on the issue, who opined that Casey's service would be allowed by Maine law.  (Id., PageID #s 340–41.)  Ultimately, Casey ran and was elected to the Council in 2018.  Given a three-year term, she would run for re-election in 2021.

### D.  Post-Election Effort to Amend Town Charter

Following Casey's 2018 election, a group of Yarmouth citizens calling themselves the "Yarmouth Citizens for Responsible Government" gathered more than 500 signatures in order to force a public vote on the Charter Amendment.  (Compl. (ECF No. 1), PageID # 11; Ans. (ECF No. 4), PageID # 29.)  At a September 17, 2018 Special Meeting of the Town Council on the Amendment, Ray expressed his belief that the Amendment was unconstitutional and motivated by a misguided concern that public employees lack impartiality.  (Joint Ex. 2-B (ECF No. 13-7), PageID #s 173–82.)  He also asserted that the Amendment was really about "taking a class of

---

[4] The Town again consulted with the Town Attorney on this issue following Casey's election.  At that time, the Town Attorney also noted the Council Rules concerning conflicts and opined that the school budget was prepared by the School Committee and ultimately approved by the town meeting, leaving little role for the Council.  Joint Ex. 4-B, PageID #s 323–25.

people and because you're presuming they have a bias that's not the one you like, eliminating them from the town council."  (Id., PageID # 176.)

At the same meeting, supporters of the Amendment expressed the following concerns:  1) the potential for conflict or a lack of impartiality; 2) the need to separate employer/employee roles; 3) interference with work relationships; 4) the potential impact on parent-teacher and teacher-student relationships causing parents to refrain from speaking before the Council on matters of public concern; and 5) concern over loyalties to co-workers affecting Councilors' performance.[5] (Id., PageID #s 182–92.)  Casey recused herself at the meetings concerning the Amendment.  (See, e.g., Joint Ex. 2B (ECF No. 13-7), PageID # 171.)  In November 2018, Yarmouth voters adopted the Charter Amendment.

### III.    DISCUSSION

Plaintiffs' Complaint frames their constitutional challenge to the Charter Amendment in three counts.  Count I asserts that the new qualifications for serving on the Town Council violate Casey's First Amendment rights to campaign and serve on the Council going forward.  (See Compl. (ECF No. 1), PageID #s 12–13.)  Count II similarly asserts that the Charter Amendment violates the First Amendment rights of two other Plaintiffs, Elizabeth and Mark Reinsborough, to the extent it restricts each of them in their ability to run and serve on the Town Council.  (See id., PageID #s 13–14.)  Finally, in Count III, all Plaintiffs assert that the Charter Amendment violates the right to free expression to the extent it restricts their ability to vote for and elect Casey or future

---

[5] Several of these rationales significantly overlap with the justifications for the Amendment that Yarmouth now identifies in its Motion.  See, e.g., Def. Mot. (ECF No. 16), PageID # 598 ("The governmental interests served by the Charter Amendment include the following: 1) avoiding conflicts of interest and the appearance thereof; 2) maintaining public trust in public officials and the efficient operation of government; . . . 4) avoiding interference with municipal government operations and work relationships, including deference or loyalty to a supervisor/employer, or conversely, undermining requests or determinations of a supervisor/employer . . . .").

Town or school department employees that might run for Town Council.  (See id., PageID #s 14–15.)

Before considering the merits of these claims, the Court first addresses a critical initial question:   the standing of the six Plaintiffs, which implicates the Court's subject matter jurisdiction.

### A.  Standing

The Constitution empowers Article III courts to decide "Cases" or "Controversies."   U.S. Const. art. III, § 2.  This constitutional phrase has long been understood "to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions."  Carney v. Adams, 141 S. Ct. 493, 498 (2020).  The doctrine of standing implements this requirement by imposing three key requirements: a litigant must prove (1) "a concrete and particularized injury" that is (2) "fairly traceable to the challenged conduct," and is (3) "likely to be redressed by a favorable judicial decision."  Id.

Elaborating on the first requirement, "standing requires an 'injury in fact' that must be 'concrete and particularized,' as well as 'actual or imminent.'"  Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)) (quotation marks consolidated).  "It cannot be 'conjectural or hypothetical.'"  Id.  Further, "a grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.' And it consequently does not show standing."  Id.  "In other words, a plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public."  Id. at 499 (internal quotation marks & citation omitted).

As to the second requirement, traceability or "[c]ausation is established by demonstrating a causal connection 'between the injury and the conduct complained of,' where the injury is 'fairly

. . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court.'" Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020) (quoting Lujan, 504 U.S. at 560–61). As to the third requirement of redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (internal quotation marks omitted) (quoting Lujan, 504 U.S. at 561).

"The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006); see also Hochendoner v. Genzyme Corp., 823 F.3d 724, 733 (1st Cir. 2016) (noting as "the settled rule that 'standing is not dispensed in gross'") (quoting Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996)). Thus, each Plaintiff must both establish standing as of the commencement of the suit and maintain it thereafter. See Carney, 141 S. Ct. at 499.

### 1. Meghan Casey

While there are six individual Plaintiffs in this case, the Court begins by focusing on Casey's standing. In the present case, Casey claims that the Charter Amendment interferes with her First Amendment rights in that it chills her ability to campaign and vote for herself and explicitly disqualifies her from serving another term.[6] Already a current Councilor, Casey expresses a desire to run for re-election while remaining employed as a Yarmouth school teacher. In short, the record establishes that she is "able and ready" to run in 2021. Cf. Carney, 141 S. Ct. at 500–02 (finding the plaintiff suffered a generalized grievance, insufficient to support standing, because he had not shown that he was "able and ready" to apply for the judgeship at issue).

---

[6] To the extent that Casey also claims injury based on how the Charter Amendment might impact her ability to support other town or school employees who might choose to run for Yarmouth Town Council in the future, the Court declines to find the requisite cognizable injury for standing on this theory. See infra III.A.2.

Nonetheless, Defendant asserts that "Casey is free to advocate, campaign, and be eligible to serve on the Town Council in the next election *if she decides to run for re-election and is reelected*." (Def. Mot. (ECF No. 16), PageID # 622.)  In essence, Defendant argues that because Casey challenges a resign-to-serve rule rather than a resign-to-run rule,[7] she must first win re-election to bring her claim.  The Court appreciates Defendant's concern as to the contingent nature of Casey's injury.  However, this case is not the first challenge to a "resign-to-serve" law, and such cases have not generally been dismissed on standing grounds.[8]  See, e.g., Fletcher v. Marino, 882 F.2d 605, 610 (2d Cir. 1989) (finding standing for one plaintiff who elected not to seek re-election due to resign-to-serve law); cf. Simmons v. Rotenberg, No. 1:87-cv-02568-RWZ, 1988 U.S. Dist. LEXIS 7258, at *6 (D. Mass. July 13, 1988) ("To hold that plaintiff's subsequent loss moots his claim would bar an effective challenge to [de facto resign-to-serve] provision.").  The Court concludes that Casey has shown that the Charter Amendment presents a particularized and imminent injury to her "actual desire" to serve another term on the Town Council.  Carney, 141 S. Ct. at 502 (explaining that "an injury in fact requires an intent that is concrete"); see also Osediacz v. City of Cranston, 414 F.3d 136, 143 (1st Cir. 2005) (suggesting that standing requires plaintiff to show "some reasonable possibility that she would be subject to the constitutionally defective action").  As a result, the Court concludes Casey has standing to pursue her claims under Counts I & III.

---

[7] By this terminology, the Court distinguishes between "resign-to-run" rules, which require public employees to resign their employment in order to run for office, and "resign-to-serve" rules, which require public employees to resign their employment only upon taking office.  See, e.g., Fletcher v. Marino, 882 F.2d 605, 614 (2d Cir. 1989) (distinguishing between resign-to-run rule and resign-to-serve rule).

[8] Further, while federal courts have generally agreed that the burden on First Amendment rights imposed by resign-to-serve laws is *less* than the burden imposed by resign-to-run laws on candidates, they have not gone as far to say there is no burden at all.  See, e.g., Fletcher, 882 F.2d at 614 (resign-to-serve provision "less restrictive than resign-to-run provision"); Claussen v. Pence, 826 F.3d 381, 385 (7th Cir. 2016) ("resign-to-run laws place a greater burden on candidacy" than resign-to-serve laws); see also Magill v. Lynch, 560 F.2d 22, 29 (1st Cir. 1977) ("Candidacy is a First Amendment freedom.").

### 2.  Mark & Elizabeth Reinsborough

Besides Casey, two other Plaintiffs, Mark and Elizabeth Reinsborough, assert an injury based on the Charter Amendment's impact on their individual ability to campaign for and serve on the Town Council.  However, the Court finds that neither satisfies the individual burden to prove an imminent and concrete injury.  For his part, Mark Reinsborough, has never suggested a clear timeframe, let alone an imminent one, for when he plans to run for the Council—in the Complaint, his timeframe for serving on the Town Council is presented as "someday."  (Compl., PageID # 8.)  "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."[9]  Lujan, 504 U.S. at 564.  As to Elizabeth Reinsborough, in addition to not detailing her timeline, her recent retirement makes the Amendment irrelevant to her eligibility to serve.[10]  Accordingly, the Court concludes that Count II is subject to dismissal for lack of subject matter jurisdiction.

### 3.  The Remaining Plaintiffs & Count III

Finally, the Court is left to consider standing by any and all of the five remaining Plaintiffs based on their assertion that the Charter Amendment impermissibly restricts their right to vote for candidates that might be employed by the Town or its school department.  "The right to vote and the right to run for elective office, to a significant extent, are intermingled," League of Women

---

[9] These concerns also arguably implicate the ripeness doctrine.  See, e.g., Daggett v. Devine, 973 F. Supp. 203, 204 (D. Me. 1997) ("State election campaigns for these plaintiffs in the year 2000 . . . are conditioned on too many intervening contingencies to make this matter appropriate for review in federal court now.  The outcome of the intervening 1998 election; unforeseen issues confronting the Legislature and the electorate in 1999 and 2000; these politicians' career choices (Maine has a part-time legislature); possible changes of residence; health and family issues; the fundraising situation in the future; political shifts--the list is endless of events or choices that might alter [their] anticipated candidacies . . . or even their individual or collective attitudes toward this legislation and thereby affect whether they are injured.").

[10] Indeed, the Court notes that, while Elizabeth Reinsborough has not withdrawn this claim, Plaintiffs have made no effort to further advance it in their motion papers.

Voters v. Diamond, 965 F. Supp. 96, 98 n.2 (D. Me. 1997), and "laws that affect candidates always have at least some theoretical, correlative effect on voters," Bullock v. Carter, 405 U.S. 134, 143 (1972); see also, e.g., Miller v. Moore, 169 F.3d 1119, 1123 (8th Cir. 1999) ("A voter . . . has standing to challenge a state law regulating elections when that law would restrict his ability to vote for the candidate of his choice or dilute the effect of his vote if his chosen candidate were not fairly presented to the voting public." (internal quotation marks omitted)).

Turning first to the three Reinsborough Plaintiffs, the Court finds that none of the Reinsboroughs have expressed a present or imminent desire to support a specific candidate affected by the Amendment. Instead, each has taken pains to disclaim any present intention to vote for a particular candidate, opting instead to keep an open mind as to how to cast any future ballot involving the Town Council. Nonetheless, they are opposed to any narrowing of the field of possible candidates, whether they would support those candidates or not. On the record presented, the Court concludes that none of Reinsborough Plaintiffs have established that they have actually endured, or will imminently endure, a specific injury from the Amendment. See Amrhein v. eClinicalWorks, LLC, 954 F.3d 328, 332 (1st Cir. 2020) ("[T]o create standing, a threatened injury must be 'imminent' or 'actual' when the plaintiffs filed their complaint."). They simply have not as yet shown that their "intended future conduct is 'arguably. . . proscribed by [the] statute' they wish to challenge," Susan B. Anthony List v. Driehaus, 573 U.S. 149, 162 (2014) (internal quotation marks omitted). Accordingly, to the extent that Count III states a claim on behalf of the Reinsborough Plaintiffs, they presently lack standing to pursue such a claim.[11]

---

[11] Once again, the jurisdictional issue can also be framed as one of insufficient ripeness. See Project Veritas Action Fund v. Rollins, 982 F.3d 813, 825–26 (1st Cir. 2020) ("[W]hen free speech is at issue . . . concerns over chilling effect call for a relaxation of ripeness requirements. . . . Still, [t]o establish ripeness in a pre-enforcement context, *a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity*." (emphasis added & internal quotation marks omitted)).

By contrast, Plaintiffs Ray and Sharpless have explicitly stated their desire to vote and/or advocate for Casey's re-election.  However, the decision on whether to run still belongs to Casey. Likewise, Casey retains the decision on what to do if she were to be elected.  These contingencies create an apparent causation issue.  See, e.g., Claussen v. Pence, 826 F.3d 381, 387 (7th Cir. 2016) (Under resign-to-serve law, public employees "are not forbidden from holding public office; if they decide not to run or retain their elected positions, *that is their choice*." (emphasis added)). Given the hypothetical and contingent nature of the harm, Sharpless and Ray do not appear to satisfy the traceability prong of the standing inquiry.

Citing Osediacz v. City of Cranston, 414 F.3d 136 (1st Cir. 2005), Plaintiffs maintain that the First Circuit has "recognized that 'a chill on speech' may be a 'cognizable injury' when then plaintiff is 'within the class of persons potentially chilled.'" (Pls. Reply (ECF No. 22), PageID # 696 (quoting Osediacz, 414 F.3d at 142).)  However, even crediting Plaintiffs' assertion that this resign-to-serve law actually chills free speech, Osediacz also held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  Osediacz, 414 F.3d at 142 (quoting Laird v. Tatum, 408 U.S. 1, 13–14 (1972)).  More generally, it is true that "certain types of facial challenges . . . premised on First Amendment grounds" have been heard as the result of the "lowering of conventional standing barriers" associated with "the traditional *jus tertii* ban on litigating the rights of third parties."  Id. at 140.  However, the Court finds no need to consider lowering the standing requirements in this case.  Here, Casey, who the Court has already concluded has standing, appears ready, willing, and able to litigate the constitutional challenge to the Charter Amendment and seeks relief that is indistinguishable from the relief sought by Sharpless and Ray.  On the record presented, the Court concludes Sharpless and Ray, like the Reinsborough Plaintiffs, presently lack standing.

To summarize, the Court will proceed to the merits as to Plaintiff Casey only, as it concludes it lacks subject matter jurisdiction as to the other Plaintiffs due to each lacking standing.

## B. Merits

At the outset, the Court begins with a presumption that the Charter Amendment, which was duly enacted by Yarmouth, is constitutional.  See MSAD 6 Bd. of Dirs. v. Town of Frye Island, 229 A.3d 514, 523 (Me. 2020) ("Legislative acts are presumed constitutional."); Alliance of Auto. Mfrs. v. Gwadosky, 353 F. Supp. 2d 97, 102 (D. Me. 2005) (beginning with a presumption of constitutionality and placing burden on plaintiff to overcome this presumption).  The Court's "view of the wisdom of a . . . provision may not color [its] task of constitutional adjudication." Clements v. Fashing, 457 U.S. 957, 973 (1982).  Rather, the Court's task is to determine whether Plaintiff has shown the Charter Amendment is either facially invalid or invalid as applied to her. The Court initially focuses on Casey's "as applied" challenge, which the Court construes as asserting that the Charter Amendment violates her First Amendment rights as a candidate, a voter, an elected official, and a public employee.  The initial point of dispute is the level of scrutiny that applies to this claim.

### 1. The Charter Amendment is Not Subject to Strict Scrutiny.

Claiming a burden to "core political speech," Plaintiff initially asks the Court to subject the Charter Amendment to strict scrutiny.  (Pls. Mot. (ECF No. 14), PageID # 519.)  Generally, "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United v. FEC, 558 U.S. 310, 340 (2010) (internal citations and quotation marks omitted).  However, as a factual matter, the Court declines to find that the Town's resign-to-serve law burdens Casey's political speech.  Rather, Casey, like all other Town and school department employees, remains free to campaign, advocate, and vote in local elections.  Rather than restrain

her speech rights, the Charter Amendment instead directly burdens Casey's ability to serve another term while she remains employed by the Yarmouth School Department and, at most, indirectly burdens her ability to run for another term.  However, it is well-established that "[c]andidacy does not rise to the level of a fundamental right."  Torres-Torres v. Puerto Rico, 353 F.3d 79, 83 (1st Cir. 2003) (per curiam); see also Claussen, 826 F.3d at 385 (holding that neither "the right to assume or hold office once elected" nor "the right to be a candidate for office" is a fundamental right).

The Court notes that Plaintiff has not cited a single case in which strict scrutiny was applied to decide a constitutional challenge to a resign-to-serve provision, nor has the Court located one. See, e.g., Grizzle v. Kemp, 634 F.3d 1314 (11th Cir. 2011) (district court erred by applying strict scrutiny to law prohibiting relatives of school employees from serving on school board because burden not severe).  Even in Callaghan v. City of S. Portland, 76 A.3d 348 (Me. 2013), a case that Plaintiff urges is "most similar" to this case, the Law Court declined to apply a strict scrutiny analysis to a city personnel policy that contained a broader restriction on candidacy and participation in local elections.  (Pl. Mot. (ECF No. 14), PageID # 532.)  Rather, the Law Court looked to "two similar tests that . . . balance the important First Amendment rights of prospective candidates and the electorate against the significant interest of the State in maintaining the efficient and trustworthy operation of government."  Callaghan, 76 A.3d at 353.  The two tests referenced by the Law Court were first announced by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563 (1968) and Anderson v. Celebrezze, 460 U.S. 780 (1983).  In lieu of strict scrutiny, Defendant argues that these more deferential balancing tests should apply to Plaintiff's challenge. The Court agrees with Defendant and declines Plaintiff's invitation to apply strict scrutiny to assess the constitutionality of the Charter Amendment.

### 2.   Testing the Constitutionality of the Charter Amendment

The balancing tests laid out in <u>Pickering</u> and <u>Anderson</u> allow for an intermediate level of scrutiny that seeks to balance governmental interests against individual First Amendment rights. Before applying any balancing test to the record presented here, the Court finds it useful to summarize both tests and consider relevant precedents that have applied each.

### a.   The <u>Pickering</u> Test

Like Casey, the plaintiff in <u>Pickering</u> was employed as a public school teacher.  However, Pickering's asserted First Amendment violation related to a different type of governmental action and a different expressive activity:  Pickering was dismissed by his school board for writing a letter to the editor expressing his views "as a citizen, taxpayer and voter." <u>Pickering</u>, 391 U.S. at 578. Ultimately, the Supreme Court found that Pickering's employer had violated his First Amendment rights when it dismissed him for exercising "his right to speak on issues of public importance." <u>Id.</u> at 574.  In doing so, the Supreme Court "declared that citizens do not surrender their First Amendment rights by accepting public employment." <u>Lane v. Franks</u>, 573 U.S. 228, 231 (2014) (describing <u>Pickering</u>).  However, the Court found that it was necessary "to . . . balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568.

Five years later, in <u>United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers ("Letter Carriers")</u>, 413 U.S. 548 (1973), the Supreme Court invoked <u>Pickering</u> while upholding restrictions on partisan political activity by federal government employees.  <u>See id.</u> at 564. Following <u>Letter Carriers</u>, the First Circuit, faced with a city charter that similarly restricted the rights of city employees to engage in a "broad range of political activities," including becoming a candidate for city office, similarly recognized that "the government may place limits on

campaigning by public employees if the limits substantially serve government interests that are 'important' enough to outweigh the employees' First Amendment rights."  Magill v. Lynch, 560 F.2d 22, 25, 27 (1st Cir. 1977).[12]

Notably, after Magill, the Supreme Court had an opportunity to consider the constitutionality of a resign-to-run provision in the Texas constitution, as well as a provision barring certain officeholders from running for the legislature for the duration of their term.  See Clements, 457 U.S. at 960.  While the challengers, who included officeholders and voters, claimed violations of both the Equal Protection Clause and the First Amendment, the Court found no violations and described "the burden on appellees' First Amendment interests in candidacy" as "insignificant" and "de minimis."[13]  Id. at 971–72.

### b.  The Anderson Test

Outside the realm of public employment, the Supreme Court has similarly developed a balancing test in the context of voters claiming violations of their First Amendment rights.  In Anderson v. Celebrezze, 460 U.S. 780 (1983), a suit considering the impact of candidate eligibility requirements on voters, the Supreme Court set out the following balancing test:

---

[12] The holding of Magill was narrowly focused:  "the government may constitutionally restrict its employees' participation in nominally nonpartisan elections if political parties play a large role in the campaigns."  Magill, 560 F.2d at 29.  However, in so holding, the First Circuit also noted that, "*[e]ven when parties are absent*, many employee campaigns might be thought to endanger at least one strong public interest, an interest that looms large[] in the context of municipal elections . . . ."  Id. (emphasis added).  For instance, "a city could reasonably fear the prospect of a subordinate running directly against his superior or running for a position that confers great power over his superior."  Id.  Further, "a fireman or policeman who runs for mayor or city council" could potentially pose "a direct challenge to the command and discipline of his agency," and "the possibilities of internal discussion, cliques, and political bargaining, should an employee gather substantial political support, are considerable."  Id.

[13] Plaintiff argues that Clements is inapposite because its prohibitions affected elected office holders rather than civil servants and the Supreme Court "distinguished the provisions in Clements from other laws governing '*civil servants*.'"  Pls. Mot., PageID # 519 n.2.  The Court notes its disagreement with this reading of Clements, which instead of distinguishing the cases implicating civil servants, found that those cases upheld restrictions broader than the restriction at issue, in part directing the result.  See Clements, 457 U.S. at 972 ("There is another reason why appellees' First Amendment challenge must fail. Appellees are *elected* state officeholders who contest restrictions on partisan political activity. Section 19 and § 65 represent a far more limited restriction on political activity than this Court has upheld with regard to *civil servants*.").

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (internal quotation marks and citations omitted) (summarizing Anderson standard).   Courts in this Circuit have applied the Anderson test to First Amendment election challenges brought by *both* candidates and voters.  See Torres-Torres, 353 F.3d at 82 (applying Anderson test to First Amendment challenge raised by mayoral candidate to restriction on candidacy); see also League of Women Voters, 965 F. Supp. at 98 n.2 (Because "[t]he right to vote and the right to run for elective office, to a significant extent, are intermingled . . . [t]he Court . . . will deal with the voter Plaintiffs' and the candidate Plaintiffs' claims in largely the same manner.").  More recently, the First Circuit has applied Anderson to a political party's challenge to a ballot access statute.  See Libertarian Party of N.H. v. Gardner, 843 F.3d 20, 32–33 (1st Cir. 2016).  In doing so, the First Circuit described Anderson as a "sliding scale" where the burden imposed will determine the level of scrutiny that the court should apply to its balancing of the interests asserted.  See id. at 31.  ("The problem for [plaintiff] is that the burden . . . is minimal, placing it at the easier-to-justify end of Anderson's sliding scale.").

### c.   Application of Anderson Balancing Test to the Charter Amendment

Plaintiff asserts that Pickering and Letter Carriers are not applicable because the Amendment is *not* an employment regulation.   (Pl. Mot., PageID #s 520–23.)   Looking at Defendant's proffered reasons for the Amendment, Plaintiff claims that the Town "has not acted '*as an employer*, in promoting the efficiency of the public services it performs through its employees.'" (Id., PageID # 520 (quoting Pickering, 391 U.S. at 568).)  The Court doubts both the

factual and legal underpinnings of Plaintiff's contention that the Amendment cannot be characterized as an employment regulation and that, consequently, Pickering should not be applied.  See, e.g., Fletcher, 882 F.2d at 613 ("While th[e] restrictions [in Letter Carriers and Broadrick] were directed primarily at the employees, and the [law at issue here] is directed at community school board members, we do not believe that this distinction is one of consequence."). Nevertheless, at this stage, even if the Court were to find merit in Plaintiff's insistence that the facts of this case place it outside Pickering's public employment regulation balancing framework, the alternative is to apply the Anderson balancing test, which is similar in many respects.  See, e.g., Callaghan, 76 A.3d at 354–55 ("[The Anderson] test, like the Pickering test, requires a reviewing court to (1) identify the First Amendment interest asserted by the employee/citizen and the magnitude of that interest; (2) identify the government's interest in restricting the First Amendment interest at issue, the strength of the justification for the restriction, and the extent to which the restriction is necessary to vindicate the government's interest; and then (3) balance factors (1) and (2) in making a determination as to which outweighs the other given the facts of a particular case.").  Thus, the Court proceeds to consider the record here under the Anderson test.

The first step under Anderson is to determine whether the Amendment imposes a severe burden on Plaintiff's rights, which dictates how the analysis proceeds thereafter.  As already discussed, the Court concludes that it does not.  As previously noted, Clements, in upholding a resign-to-run provision, held the appellees' injury to be "*de minimis*."  457 U.S. at 971–72.  As resign-to-run statutes, which prevent prospective candidates from even campaigning, are more restrictive than resign-to-serve statutes, the effect of the Amendment is necessarily even more "*de minimis*" than the law upheld in Clements.  Several circuits have agreed with this point.  See, e.g., Loftus v. Bobzien, 848 F.3d 278, 287 (4th Cir. 2017) ("If a public employee can be prohibited

from running for office, it follows all the more strongly that she also can be barred from holding elective office while remaining a public employee."); Fletcher, 882 F.2d at 613 (Resign-to-serve law "does no more than prohibit certain municipal employees, political party office holders and elected officials from being community school board members.  It does not stop anyone from running for any office."); cf. Claussen, 826 F.3d at 385 ("[T]he contested [resign-to-serve] law has a negligible impact on voters.  [It] does not exclude candidates from the ballot or bar would-be candidates from running for office.").

At the second step under Anderson, having determined the burden is not severe, the Court next asks if the Amendment "constitutes a 'reasonable, nondiscriminatory restriction' which . . . is sustainable under the First Amendment in light of the [Town's] 'important regulatory interest.'" Torres-Torres, 353 F.3d at 83.  First, the Court finds Amendment "applies even-handedly, without discriminating on the basis of viewpoint or any other suspect classification."  Id.[14]  As to an "important regulatory interest," in its Motion, Defendant identifies the following interests:

1)  avoiding conflicts of interest and the appearance thereof;

2)  maintaining public trust in public officials and the efficient operation of government;

3)  avoiding self-dealing/self-interested behavior and the appearance thereof;

4)  avoiding interference with municipal government operations and work relationships, including deference or loyalty to a supervisor/employer, or conversely, undermining requests or determinations of a supervisor/employer;

5)  avoiding granting to Town employees the authority as members of the Town Council to withhold approval to send the annual budget or related items to voters until the Town Council is satisfied with the proposed gross allocation and

---

[14] At points in the record presented, there were insinuations that the purpose of the Amendment was to quash the viewpoint of teachers, particularly on budgetary issues.  However, Plaintiff herself has neither alleged nor argued that the Amendment was a viewpoint-based restriction, which could have compelled a different analysis.  See League of Women Voters, 965 F. Supp. at 100 ("Generally, election laws that can be characterized as content based will be subjected to strict scrutiny.").

> appropriation of revenues, which include allocations and appropriation for salaries of Town employees; [and]
>
> 6) avoiding a situation where a member of the Town Council may exercise authority in that role so as to influence his or her own compensation, benefits, and status as an employee of the Town.

(Def. Mot. (ECF No. 16), PageID # 598) (formatting adjusted).[15]  Defendant asserts its "need to vindicate [these interests] is a function of the unique role of the Town Council in relation to creation of the Town's proposed annual budget, as well as past instances (some of which involve[ed] certain Plaintiffs) where there have been real and perceived conflicts of interest (by which an employee has a stake in the outcome of deliberations), interference with government operations and work relationships, and concerns that an employee serving on the Town Council may favor his or her department employer/supervisor, or, conversely, defy his or her superior, upsetting the chain of command."  Id.

Even in nonpartisan elections, a municipality can have important reasons for placing restrictions on candidates (and, by extension, those eligible to take office).  See Magill, 560 F.2d at 29.  These include possible disruptions in the employer-employee relationship, challenges to the command and discipline of a municipal agency, and "possibilities of internal discussion, cliques, and political bargaining, should an employee gather substantial political support."  Id.  These interests, which Magill labeled as "considerable," are similar to those that were identified both in public deliberations on the Charter Amendment and in Defendant's motion papers, and this Court finds them to be important and reasonable.  In particular, given the Council's important role in the

---

[15] To the extent that Plaintiff argues that the Court should "disregard any evidence on the question of the governmental purpose served by the Charter Amendment that was generated in response to this lawsuit," this argument seems moot given the similarities between the interests identified at the September 2018 public hearing on the Amendment and those proffered by Defendant in this litigation.

annual budgetary process, the Court finds Defendant's concerns over the potential for the appearance of conflict and potential negative effects in the workplace to be eminently reasonable.[16]

Given the *de minimis* interference with Plaintiff's rights, Defendant's asserted justifications are valid and sufficient to justify the Charter Amendment.[17]  See, e.g., Mays v. LaRose, 951 F.3d 775, 789 (6th Cir. 2020) ("No opinion from this court or the Supreme Court has ever limited the record that the State can build in order to justify a burden placed on the right to vote."); Dudum v. Arntz, 640 F.3d 1098, 1116 n.28 (9th Cir. 2011) (plaintiff objected to City's justifications for runoff voting system as "impermissible *post hoc* rationales," but court was "far from sure that the normal ability of litigants to advance arguments justifying their out-of-court behavior is suspended in election challenge[] where . . . the burden imposed on voting is minimal at best"). Notwithstanding Plaintiff's assertions to the contrary, the Court declines to find that Defendant's lack of recent specific examples of the claimed potential for conflicts of interests impacts the legitimacy of its asserted interests.[18]  See Loftus, 848 F.3d at 287 ("The principles illustrated in Letter Carriers and Clements on avoiding conflicts of interest, or even the appearance of impropriety, do not appear to require that either an actual or potential conflict of interest exist

---

[16] Other circuits have similarly acknowledged both that nonpartisanship character of an election is not controlling and that interests similar to the ones Defendant seeks to vindicate are weighty.  See Loftus, 848 F.3d at 288 ("[A]ny partisan/non-partisan distinction is immaterial, particularly where a potential conflict of interest exists.  The evils underlying the rule in Letter Carriers—'such human traits as personal ambition, greed, fear, and the like'—are made 'no less harmful merely because they may be brought about by political pressures generated in a nonpartisan, rather than a partisan, political context.'"); Claussen, 826 F.3d at 386 ("Indiana has a genuine and compelling interest in avoiding corruption and self-dealing and the appearance of such things.").

[17] To the extent that Plaintiff contends the interests presently asserted by the Town should be discounted because neither the Town Attorney nor the Town Manager were contemporaneously alarmed by Casey's 2018 candidacy or by any potential for conflict, the Court disagrees.  See, e.g., Libertarian Party, 843 F.3d at 31  (relying on "statements of the state's interest first identified in litigation briefs").

[18] Plaintiffs have essentially asked the Court to force Defendant to delay buying an umbrella until it gets caught in a rainstorm.  Cf. Shelby Cty. v. Holder, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting) ("Throwing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet.").

in fact in order for restrictions on political activity of public employees to apply consonant with the First Amendment.").

Moreover, while Plaintiff insists that the Amendment is not appropriately tailored to Yarmouth's asserted interests, under <u>Anderson</u>, when the burden imposed is not severe, Defendant "is *not* required to show that its system is narrowly tailored—that is, is the one best tailored to achieve its purposes." <u>Dudum</u>, 640 F.3d at 1114.  Rather, "when a challenged rule imposes only limited burdens . . . there is no requirement that the rule is the only or the best way to further the proffered interests." <u>Id.</u>; <u>cf.</u> <u>Claussen</u>, 826 F.3d at 386 n.6 ("Plaintiffs contend that because Indiana has imposed safeguards on municipal corruption, the Indiana Law is unnecessary.  But it is not for this Court to decide whether the law is necessary or even advisable.").  Furthermore, even if narrow tailoring were applicable, this would still be a difficult argument considering the numerous more restrictive resign-to-run provisions that have been upheld.  <u>See, e.g.</u>, <u>Loftus</u>, 848 F.3d at 287 ("If the resign-to-run and automatic resignation provisions [at issue in <u>Clements</u>]—which stripped certain public employees of their office upon declaring their candidacy for the state's legislature— pass muster under the First Amendment, surely the termination of Loftus' employment only after her election to the City Council survives First Amendment scrutiny."); <u>Claussen</u>, 826 F.3d at 385– 86 ("[U]nlike the resign-to-run laws that have been deemed constitutional, the Indiana Law allows a candidate to remain employed while taking a chance on the electoral process.  As such, the Law's chilling effect on candidacy, and thus voters' exercise of the franchise, is lessened."); <u>Claussen v. Pence</u>, No. 2:15-cv-52-PPS, 2015 U.S. Dist. LEXIS 161977, at *7–8 (N.D. Ind. Dec. 2, 2015) (collecting cases).

Finally, to the extent that Plaintiff suggests that the result here should mirror the holding of <u>Callaghan v. City of S. Portland</u>, 76 A.3d 348 (Me. 2013), the Court disagrees.  In <u>Callaghan</u>,

the Law Court rejected the facial challenge to the resign-to-run policy at issue, while finding the policy unconstitutional as applied to a pair of part-time employees of the City's Library and Parks and Recreation Departments.  See id. at 359.  Here, the Court agrees with Defendant that Callaghan is distinguishable due both to the type of rule at issue and the facts presented.  (See Def. Mot., PageID # 610.)

Based on the record presented and the Court's weighing of the interests identified by the parties under the Anderson balancing test, the Court concludes that the Charter Amendment does not unconstitutionally burden Casey's First Amendment rights.[19]  It flows from this conclusion that the Court also rejects Casey's facial challenge to the Charter Amendment.

## IV.   CONCLUSIONS OF LAW

In light of the just-stated factual findings and analysis of the legal issues presented, the Court makes the following conclusions as to the pending claims:

1) As to Count I, the Court concludes that Casey has not met her burden of establishing that Defendant has violated her First Amendment rights and 42 U.S.C. § 1983 by enacting the resign-to-serve provision contained in the 2018 Charter Amendment. As a result, Defendant is entitled to judgment on Count I.

2) As to Count II, in which Plaintiffs Elizabeth Reinsborough and Mark Reinsborough claim a violation of their rights to campaign and serve on the Yarmouth Town Council, the Court finds both Plaintiffs lack standing.  As a result, Count II is subject to dismissal for lack of subject matter jurisdiction.

3) As to Count III, which asserts a claim under 42 U.S.C. § 1983 by all six Plaintiffs, the Court concludes that five of the Plaintiffs lack standing to press this claim on

---

[19] The Court notes that its conclusion would remain the same under Pickering, which involves a similar weighing of interests.  See Pickering, 361 U.S. at 568.

the record presented.  As to Plaintiff Casey, the Court concludes she has standing but that Defendant is entitled to judgment on the merits.

## V.    CONCLUSION

In accordance with the findings of fact and conclusions of law stated herein, the Court GRANTS Defendant's Motion for Judgment on a Stipulated Record (ECF No. 16) and DENIES Plaintiff's Motion for Judgment on a Stipulated Record (ECF No. 14).  Judgment shall enter in favor of Defendant on all counts.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 21st day of January, 2021.